# Court of Appeals, State of Michigan

## ORDER

Paulette Elher v Dwijen Misra Jr MD

Docket No. 316478

LC No. 2011-116694-NH

Jane M. Beckering
Presiding Judge

Joel P. Hoekstra

Elizabeth L. Gleicher
Judges

The Court orders that the November 25, 2014 opinion is hereby VACATED, and a new opinion is attached.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

DEC 02 2014
Date

Chief Clerk

# STATE OF MICHIGAN

# COURT OF APPEALS

PAULETTE ELHER,

          Plaintiff-Appellant,

v

DWIJEN MISRA, JR., M.D., MURPHY &
MISRA, M.D., P.C., and WILLIAM BEAUMONT
HOSPITAL,

          Defendants-Appellees,

and

PREFERRED MEDICAL GROUP and
PREFERRED FAMILY MEDICINE,

          Defendants.

FOR PUBLICATION
December 2, 2014
9:05 a.m.

No. 316478
Oakland Circuit Court
LC No. 2011-116694-NH

Before: BECKERING, P.J., AND HOEKSTRA AND GLEICHER, JJ.

GLEICHER, J.

Before admitting expert medical testimony, a trial court must ensure that it is not infected with junk science. Michigan Rule of Evidence 702 and MCL 600.2955 provide trial courts with the general standards they need to fulfill this gatekeeping obligation. At issue in this medical malpractice case is how those standards apply to a difference of opinion among highly qualified experts concerning whether a surgical error constitutes a violation of the standard of care.

The underlying facts are simple. Defendant Dwijen Misra, Jr., a general surgeon, clipped the wrong bile duct during plaintiff Paulette Elher's laparoscopic gallbladder surgery. Plaintiff's expert, a general surgeon with extensive experience in the procedure, testified that clipping a patient's common bile duct during an otherwise uncomplicated operation is a breach of the standard of care. Defendants' expert opined that bile duct injuries frequently occur even absent professional negligence. Defendants insisted that plaintiff's expert's testimony did not qualify as reliable under MRE 702 because the expert could not specifically identify any peer-reviewed literature or other physicians who supported his viewpoint. The trial court agreed with defendants, excluded plaintiff's expert's testimony, and dismissed the case.

We hold that the trial court incorrectly applied MRE 702 and abused its discretion by excluding the testimony of plaintiff's expert witness—Dr. Paul Priebe. The reliability factors invoked by the trial court to reject Dr. Priebe's standard-of-care opinion lacked relevance to the testimony offered and the evidence received. Neither the soundness of a scientific methodology nor the legitimacy of underlying data plays a role here. Rather, the experts' disagreement focuses on scientifically sustainable and equally justifiable *conclusions*. MRE 702 requires that an expert's opinion rest on reliable scientific principles. Once that foundation has been established, MRE 702 does not empower trial courts to determine which of several competing expert opinions enjoys more support. Here, the evidence validated that Dr. Priebe grounded his opinions in "good science." Accordingly, a jury must decide whether to credit his views.

## I. FACTS AND PROCEEDINGS

Dr. Misra removed Elher's gallbladder laparoscopically. Technically called a laparoscopic cholecystectomy, this surgery is performed by passing long, narrow instruments and a magnification camera called a laparoscope through several small abdominal incisions. The laparoscope transmits images from the surgical site to video monitors in the operating room. The surgeon manipulates the specialized instruments while viewing the images on the monitors.

An initial step in the procedure involves careful identification of the cystic artery and the cystic duct. After locating these structures, the surgeon places clips above and below the point where each will be divided. The surgeon then cuts the tissue between the clips. Once the cystic artery and the cystic duct have been severed, the gallbladder is dissected away from the liver bed and removed from the abdomen. The cystic duct's continuity must be sacrificed to remove the gallbladder, but the patient's other bile ducts, in particular the common bile duct, are supposed to remain intact.

Dr. Misra clipped Elher's common bile duct. Elher's expert believes that when neither scarring nor inflammation obscures the surgeon's vision, it is a breach of the standard of care to injure the common bile duct. Defendants claim that injuries can happen even in the presence of due care because the laparoscope creates optical "illusions" that may lead the surgeon astray. This debate frames the evidentiary issue presented to the trial court.

Approximately nine weeks after the operation, Elher presented at a hospital with abdominal pain, nausea, vomiting, and jaundice. A radiologic study called an ERCP revealed that a clip obstructed her common hepatic duct.[1] Surgery was performed to remove the clip and to reconstruct her biliary drainage system.

---

[1] The parties and their expert witnesses refer to the clip as having been placed on either the common hepatic duct or the common bile duct, using the anatomical terms interchangeably. Dr. Misra stated: "The clip is on the common bile duct because of the surgery that I performed." Placement of the clip on either the hepatic or the common bile duct (which are essentially one continuous structure) was not part of the surgical plan, and the parties agree that this untoward event triggered Elher's illness and her need for additional surgery.

Elher subsequently filed this medical malpractice suit. Her complaint avers that the standard of care applicable to Dr. Misra required that he:

1.    Refrain from clipping or obstructing the common bile duct during the performance of a laparoscopic cholecystectomy that is identified as an uncomplicated procedure in the operative note.

2.    To unequivocally identify the cystic duct and ensure that no anatomic structures are clipped or cut without certain identification.

3.    To convert to an open procedure if there is any doubt as to the proper anatomical identification of each element of the biliary tree.

Dr. Misra breached the standard of care, the complaint continues, by:

1.    Fail[ing] to refrain from clipping or obstructing the common bile duct during the performance of a laparoscopic cholecystectomy that is identified as an uncomplicated procedure.

2.    Failing to unequivocally refrain from clipping or obstructing the common bile duct during the performance of a laparoscopic cholecystectomy that is identified as an uncomplicated procedure.

3.    Failing to convert to an open procedure if there was any doubt in Defendant's mind as to the proper anatomical identification of each element of the biliary tree . . . .

The complaint also stated a res ipsa loquitur claim.

Elher filed an affidavit of merit signed by Dr. Paul Priebe, a board certified general surgeon. Dr. Priebe's affidavit reiterates the standard of care requirements and violations pleaded in the complaint.

Dr. Misra denied that he had violated the standard of care. At his deposition he explained that although "I don't want to clip the hepatic duct," "[t]he view from the laparoscope is not optimal and not recognized as optimal and illusions can be created in which the ducts could be clipped." He clarified: "illusions can occur in a two-dimensional video image that can create an illusion that, according to standard anatomy, the cystic duct and cystic artery are what they appear to be, but the common bile duct in this case was in that illusion." In Dr. Misra's estimation, this complication occurs in 0.5 to 2 percent of all laparoscopic gallbladder surgeries. Dr. Misra has performed approximately 3,000 to 5,000 such procedures and twice clipped the wrong duct, Elher's surgery included. In the other case, he recognized the error during the operation.

Dr. Priebe, an associate professor of surgery at Case Western Reserve University, performs 50 to 80 laparoscopic gallbladder surgeries each year and has done so since learning the technique in 1990. He expressed that "absent extensive inflammation or scarring . . . virtually every case of . . . major bile duct injury . . . , in my opinion, would be malpractice." Dr.

Priebe opined that regardless of a surgeon's particular operative approach, "the general rule is that everything should be identified before anything is cut, any major structure." He admitted to having personally injured a patient's common bile duct when "the anatomy couldn't be delineated because of the scarring and inflammation[.]" When asked whether he could "cite to any medical literature" supporting his standard of care opinion, Dr. Priebe replied: "[M]edical literature doesn't discuss standard of care," later reprising: "[t]here is no authority that exists to do that." Dr. Misra violated the standard of care, Dr. Priebe submitted, "as it relates to delineating the anatomy as he performed the laparoscopic cholecystectomy."

Dr. John Webber, a general surgery expert proffered by defendants, admitted that bile duct injuries may result from medical negligence: "I'm saying there are instances where you can have an injury to the common [bile] duct and it could be malpractice and there are instances where it wouldn't be malpractice." He disagreed that bile duct injuries occurring during uncomplicated surgeries qualify as negligent per se. Dr. Webber partially premised his opinion on an editorial written by Dr. Josef E. Fischer in The American Journal of Surgery. According to Dr. Webber, the editorial stands for the proposition that "bile duct injuries can occur and is [sic] an inherent risk of the procedure without being below the standard of care."

Dr. Fischer's essay, a centerpiece of defendants' legal argument, is labeled by The American Journal of Surgery as an "Editorial Opinion."[2] The abstract states:

> The author believes that injury to the common duct during laparoscopic cholecystectomy is not a result of the practice below the standard, but an inherent risk of the operation. This injury needs to be emphasized by the surgical community as an inherent risk of the operation, and patients should be fully informed of this potential complication. [Fischer, *Is Damage to the Common Bile Duct During Laparoscopic Cholecystectomy an Inherent Risk of the Operation?*, 197 The American Journal of Surgery 829, 829 (2009).]

Because the Fischer editorial figures prominently in this case, we highlight several additional portions.

Dr. Fischer observed that bile duct injury occurs slightly more frequently in the laparoscopic gallbladder procedure than in conventional, open operations. *Id.* at 830. He reviewed various techniques for correctly identifying the bile duct anatomy, observing that "[a]ny or all of these together can help decrease the incidence of common duct injury, but the methods are not foolproof." *Id.* Despite precautions, Dr. Fischer opined, common duct injuries occur, and "[s]omehow the trial bar has converted a complication of a procedure that has remained stable, can seemingly occur to anyone, and can occur to acknowledged skilled surgeons, into 'practice below the standard.' " *Id.*

---

[2] We note that the copy of the Fischer article provided to the trial court was so poorly reproduced that it was essentially unreadable, and appears not to include the heading "Editorial Opinion." Because we could not read the record version of the article, we obtained a copy directly from the journal. We have attached the first page of the article as an exhibit to this opinion.

-4-

Dr. Fischer cited a study performed by Dr. Lawrence Way and several other surgeons concluding that "'practice below the standard' is not a cause of 97% of bile duct injuries." *Id.* at 831. Two other published articles, Dr. Fischer claimed, "came close to declaring that common duct injury, after going through the usual drill of how to avoid it, might not be 'practice below the standard.'" *Id.* Dr. Fischer concluded with the following pertinent paragraphs:

> One feels strange arguing that an acknowledged complication of a commonly performed procedure is not "practice below the standard." However, it would seem to me that if one persisted and tried to determine in 2 or 3 or even 4 ways what the anatomy was so as not to damage the common duct and the common duct was damaged nonetheless, that this is certainly not "practice below the standard." I know I may be opposed by some hepatobiliary surgeons who would argue that "if you don't know what you you're doing, you shouldn't do it." But I have seen really excellent and highly experienced surgeons somehow damage the common duct inadvertently.

> Surgery is not a science. It is an art. It is not an arcane art. It can be learned by anyone and mentoring helps. However, it does appear that even the most experienced laparoscopic surgeon can sometimes fall afoul of the vagaries of the art of surgery.

> This article will draw howls undoubtedly not only from the legal bar but also from some experienced surgeons who are purists. I do not believe that that is appropriate. We put our egos and our skill on the line every time we enter the operating room and sometimes that skill is insufficient despite out best efforts. . . . [*Id.*]

Defendants filed several additional medical articles with the trial court, including the article authored by Dr. Way. The articles generally discuss bile duct injuries and their causes. The Way article begins as follows: "Bile duct injuries are the main serious technical complication of laparoscopic cholecystectomy." Way et al, *Causes & Prevention of Laparoscopic Bile Duct Injuries*, 237 Annals of Surgery 460, 460 (2003). In it, the authors analyze 252 operations involving bile duct injuries by applying "scientific principles from human factors research and cognitive psychology." *Id.* at 468.[3] The article posits that the authors considered some surgical errors resulting in bile duct injuries "to represent faulty decision-making or a knowledge error if the data indicated that . . . the surgeon had departed from the orthodox operative strategy for performing a laparoscopic cholecystectomy . . . ." *Id.* at 461. It continues: "We considered that the fault was at the action or skill level when there was evidence that the dissection was performed in a clumsy way; when an identified duct being cleared of connective tissue was accidentally cut or cauterized." *Id.* Many injuries, the authors concluded, were due to "misperception . . . at a subconscious level in response to certain uncommon anatomic illusions." *Id.* at 468. Misperception errors, the authors submitted, "do[] not meet the

---

[3] We note that the authors of the Way article are all physicians. The article does not describe their expertise, if any, in the science of human factors.

defining criteria of medical negligence." *Id.* The remaining articles filed by defendants do not discuss standard of care issues.[4]

Defendants sought summary disposition pursuant to MCR 2.116(C)(10) on three grounds. First, defendants asserted, Dr. Priebe's opinions lacked reliability under MRE 702. The crux of defendants' argument was that Dr. Priebe could not point to any peer-reviewed literature endorsing his view of the standard of care, and disdained consideration of his colleagues' views. The Fischer editorial, defendants argued, supported that bile duct injuries are not the result of medical negligence. Defendants next alleged that because injury to the common bile duct is a recognized complication of laparoscopic cholecystectomy, the res ipsa loquitur doctrine did not apply. Defendants further argued that Elher failed to properly plead damages and did not have sufficient expert testimony with regard to causation. Elher filed a responsive brief, but failed to put forward any evidence buttressing Dr. Priebe's opinions.

The trial court ruled that Dr. Priebe's opinions were not reliable, summarizing:

> The problem here is that Plaintiff does not squarely address the issue of whether her expert's testimony is reliable under MRE 702 or even meets any of the requirements of MCL 600.2955. Plaintiff merely points to Dr. Priebe's experience and background arguing that his opinion is reliable and therefore admissible. However, Plaintiff must present more than his own opinions, his "stellar" credentials, and the number of procedures he has performed. Plaintiff cannot merely conclude without more that the opinion of Dr. Priebe is based on sufficient facts or data.

Dr. Priebe's testimony was deficient, the trial court found, because it did not conform to the MRE 702:

> Here, there is no evidence that Dr. Priebe's opinion and its basis have been subjected to scientific testing and replication. There is no evidence that Dr. Priebe's opinion and its basis have been subjected to peer review publication. There is no evidence as to the degree to which the opinion and its basis are generally accepted within the relevant expert community. To the contrary, Dr. Priebe admits there is "no authority" that exists as to his standard of care opinion other than his "own belief system."
>
> Furthermore, Dr. Priebe cannot cite to any medical literature to support his self-definition and belief system. According to Dr. Priebe, medical literature does not discuss standard of care or otherwise support his opinion because the authority

---

[4] Elher's counsel filed several articles with this Court in support of Dr. Priebe's standard of care testimony. Because the articles were not submitted to the trial court, we have not read or considered them. See MCR 7.210(A)(1); *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56; 649 NW2d 783 (2002) ("This Court's review is limited to the record established by the trial court, and a party may not expand the record on appeal.").

does not exist. He acknowledges that there are national and local colleagues who disagree with his exception for extensive inflammation or scarring, but discounts those opposing views as just others being entitled to their opinions. He is not aware of any General Surgery colleague at Case Western who agrees with that, other than extensive scarring or inflammation, it is always breach of the standard of care to injure the common bile duct during a laparoscopic cholecystectomy. He does not know of any board-certified general surgeons who agree with him that it is always a breach of the standard of care to injure the common bile duct during laparoscopic cholecystectomy surgery, unless there is extensive scarring or inflammation.

The trial court next found the res ipsa loquitur doctrine inapplicable, as injury to the common bile ducts constitutes a risk of the procedure and the causes of this complication were not within the common understanding of lay jurors. After ruling the res ipsa loquitur doctrine inapposite and Dr. Priebe's testimony "unreliable and inadmissible," the trial court granted summary disposition in favor of defendants. The trial court did not address defendants' argument that plaintiff had failed to establish her claim for damages. Elher appeals.

## II. ANALYSIS

The facts underlying this case are not in dispute. Dr. Misra mistook Elher's common bile duct for her cystic duct. He clipped both rather than just the cystic duct. The medical experts agree that the common bile duct should not have been clipped, and that the injury to Elher's common bile duct occasioned extensive repair surgery. The debate centers on whether Dr. Misra's error qualifies as surgical negligence or excusable error—a nonnegligent accident precipitated by perception problems produced by the equipment. Science cannot settle this dispute. Because the experts' disagreement boils down to a difference of opinion regarding an issue outside the realm of scientific methodology, neither MRE 702 nor MCL 600.2955 stands in the way of Dr. Priebe's testimony.

We review for an abuse of discretion a circuit court's evidentiary rulings. *People v Farquharson*, 274 Mich App 268, 271; 731 NW2d 797 (2007). When our inquiry concerns whether the trial court correctly applied a rule of evidence, our review is de novo. *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012). Thus, we apply de novo review in assessing whether the trial court performed its gatekeeping role in conformity with the legal principles articulated in *Gilbert v DaimlerChrysler Corp*, 470 Mich 749; 685 NW2d 391 (2004), in which our Supreme Court adopted the *Daubert* framework.[5] If the trial court correctly executed its gatekeeping role, we review its ultimate decision to admit or exclude scientific evidence for an abuse of discretion. *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004). When a trial court excludes evidence based on an erroneous interpretation or application of law, it necessarily abuses its discretion. *Kidder v Ptacin*, 284 Mich App 166, 170; 771 NW2d 806 (2009).

---

[5] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

## A. MRE 702

We begin our analysis with MRE 702, which governs the admission of expert testimony:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Court of Appeals for the Third Circuit has referred to the substantively similar FRE 702's parameters as embodying "a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel Estate of Schneider v Fried*, 320 F3d 396, 404 (CA 3, 2003). Here, the sole issue is reliability.

MRE 702 explicitly incorporates the standards of admissibility set forth in *Daubert*. *Gilbert*, 470 Mich at 782. *Daubert* focuses on evidentiary reliability. To assist judges in performing the requisite analysis, the Supreme Court outlined four factors that might assist judges in gauging reliability: 1) whether the expert's theory can be and has been tested; 2) whether the theory has been subjected to peer review or publication; 3) the theory's known or potential rate of error and the existence of standards controlling the technique's operation; and 4) the extent to which the methodology or technique employed by the expert is generally accepted in the scientific community. *Daubert*, 509 US at 593-594.

This analysis does not hinge on discovering "absolute truth" or resolving "genuine scientific disputes." *Chapin v A & L Parts, Inc*, 274 Mich App 122, 127; 732 NW2d 578 (2007). "[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." *Daubert*, 509 US at 590. Rather, the trial court is tasked with filtering out unreliable expert evidence. "The inquiry is into whether the opinion is rationally derived from a sound foundation." *Chapin*, 274 Mich App at 139. "The standard focuses on the scientific validity of the expert's methods rather than on the correctness or soundness of the expert's particular proposed testimony." *People v Unger*, 278 Mich App 210, 217-218; 749 NW2d 272 (2008). The United States Supreme Court emphasized in *Daubert*,

> The inquiry envisioned by Rule 702 is . . . a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate. [*Daubert*, 509 US at 594-595].

In *Kumho Tire Co, Ltd v Carmichael*, 526 US 137, 152; 119 S Ct 1167; 143 L Ed 2d 238 (1999), the United States Supreme Court reviewed and clarified the reliability principles laid out in *Daubert*. One question presented in *Kumho* was whether a trial court evaluating proposed

engineering expert testimony "*may* consider several more specific factors that *Daubert* said might 'bear on' a judge's gatekeeping determination." *Id.* at 149 (emphasis in original).

These factors include:

—Whether a "theory or technique . . . can be (and has been) tested";

—Whether it "has been subjected to peer review and publication";

—Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and

—Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." [*Id.* at 149-150 (citation omitted).]

The Supreme Court resolved the inquiry in the following manner: "Emphasizing the word 'may' in the question, we answer that question yes." *Id.* at 150.

The Court then expounded on its answer, accenting that the inquiry under Rule 702 is "'a flexible one'" in which the factors cited "do *not* constitute a 'definitive checklist or test.'" *Id.* (emphasis in original). In some cases, the Court volunteered, "the relevant reliability concerns may focus on personal knowledge or experience." *Id.* Using language especially relevant to the case before us, the Supreme Court continued: "And *Daubert* adds that the gatekeeping inquiry must be 'tied to the facts' of a particular case." *Id.* This means that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." *Id.* The Court stressed that the applicability of the *Daubert* factors necessarily varies case by case, expert by expert. "Too much depends upon the particular circumstances of the particular case at issue" to impose hard and fast rules. *Id.*

Our Supreme Court's opinion in *Edry v Adelman*, 486 Mich 634; 786 NW2d 567 (2010), is entirely consistent with this approach. In *Edry*, the Supreme Court reviewed a trial court's exclusion of causation testimony in a medical malpractice case arising from the delayed diagnosis of breast cancer. The challenged expert witness opined that the delay reduced the plaintiff's five-year survival chance to 20%. *Id.* at 637. The expert maintained this position even after being confronted with authoritative data reflecting a 60% five-year survival rate, and failed to substantiate his view with any countervailing literature or data. *Id.* The Supreme Court upheld the exclusion of his testimony, holding that it "failed to meet the cornerstone requirements of MRE 702." *Id.* at 640. The Court continued, "Dr. Singer's opinion was not based on reliable principles or methods; his testimony was contradicted by both the defendant's oncology expert's opinion and the published literature on the subject that was admitted into evidence, which even Dr. Singer acknowledged as authoritative." *Id.* The testimony was deficient, the Court summarized, because it lacked "some basis in fact," as well as a foundation demonstrating that it drew upon reliable principles or methods, or that the witness had reliably applied his methods to the facts of the case. *Id.* at 641.

The Court took pains to point out that "peer-reviewed, published literature is not always a necessary or sufficient method of meeting the requirements of MRE 702[.]" *Id.* In that case, however, "the lack of supporting literature, combined with the lack of any other form of support" for the expert's risk calculation rendered his testimony inadmissible. *Id.*

We draw from *Kumho* and *Edry* several important lessons. A court screening scientific evidence must ensure that proposed scientific or technical testimony is reliable as well as relevant. But the algorithm for this analysis cannot be scripted in advance or applied in a vacuum. Rather, a court must determine which factors reasonably measure reliability given the specific factual context and contours of the testimony presented.

Dr. Priebe's qualifications—his "knowledge, skill, experience, training, [and] education"—are not in dispute. Given the number of laparoscopic gallbladder surgeries he has performed (more than 2,000) and his board certification as a general surgeon, he is qualified to express opinions regarding the standard of care. See also MCL 600.2912a and MCL 600.2169. Moreover, Dr. Priebe's testimony elucidates the reasons that his particular experience qualifies him to opine regarding the standard of care. Dr. Priebe acknowledged that he "keep[s] up to date with the American College of Surgeons' materials" regarding laparoscopic cholecystectomy, participates in Case Western's weekly morbidity and mortality committee meetings, and teaches a specific method described in the medical literature for avoiding common bile duct injuries. He expressed a fully accurate understanding of the meaning of the term "standard of care." He readily conceded that "multiple other highly regarded experts . . . disagree with any suggestion that it's always a breach of the standard of care" to injure the common bile duct during uncomplicated laparoscopic gallbladder surgery, stating "yes, there are . . . experts on both sides of this." Given this testimony, an adequate foundation demonstrates Dr. Priebe's familiarity with the standard of care applicable to general surgeons performing laparoscopic gallbladder surgery.

Nor has the "fit" of Dr. Priebe's opinions to the case facts precipitated any "analytical gap" debate. In fact, the parties agree about the anatomy of the bile duct system, the manner the surgery is typically performed, the methods available to prevent injury, the consequences of erroneously severing the common bile duct, and that Dr. Misra believed he had an unobstructed, clear view of the surgical site.[6] Their opinions diverge only as to whether in Elher's case, Dr. Misra violated the standard of care by clipping the common bile duct. The question before us is whether a jury should hear Dr. Priebe's view.

MRE 702, enhanced by *Daubert*, sets forth four familiar reliability guideposts focusing on testing, peer-review, the known and potential error rate of the expert's methodology, and general acceptance of the technique in the relevant scientific community. Consistent with its "gatekeeper" role, a trial court must also consider the factors listed in MCL 600.2955(1). *Clerc v Chippewa Co War Mem Hosp*, 477 Mich 1067, 1068; 729 NW2d 221 (2007). The Legislature dictated that the following factors inform a trial court's analysis under MRE 702:

---

[6] At his deposition Dr. Misra agreed with the statement in his operative report that the cystic duct had been "well-identified."

(1)     In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact.  In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a)     Whether the opinion and its basis have been subjected to scientific testing and replication.

(b)     Whether the opinion and its basis have been subjected to peer review publication.

(c)     The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d)     The known or potential error rate of the opinion and its basis.

(e)     The degree to which the opinion and its basis are generally accepted within the relevant expert community.  As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f)     Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g)     Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

(2)     A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field.

(3)     In an action alleging medical malpractice, the provisions of this section are in addition to, and do not otherwise affect, the criteria for expert testimony provided in [MCL 600.2169].  [MCL 600.2955.][7]

---

[7] According to the statute's plain terms, the trial court's task is to "consider" the factors in assessing reliability.  To "consider" means to "1. to look at carefully; examine 2. to think about in order to understand or decide; ponder [to consider a problem] 3. to keep in mind; take into

Four of the seven factors identified in MCL 600.2955 (subparts (a)-(d)) derive directly from *Daubert*, 509 US at 593-594, and overlap with the components of MRE 702. This Court has held that each of these statutory factors need not favor the proposed expert's opinion. *Chapin*, 274 Mich App at 137 (opinion by DAVIS, J.). It suffices that "the opinion is rationally derived from a sound foundation." *Id.* at 139. *Kumho* explained that a similar approach governs the application of FRE 703: "*Daubert* . . . made clear that its list of factors was meant to be helpful, not definitive. Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Kumho*, 526 US at 151.

Against this backdrop, we review the trial court's Rule 702 analysis.

The trial court rested its decision on three of the *Daubert* guideposts: the absence of "scientific testing and replication" for Dr. Priebe's standard of care view, the lack of evidence that "Dr. Priebe's opinion and its basis have been subjected to peer review publication," and Elher's failure to demonstrate "the degree to which [Dr. Priebe's] opinion and its basis are generally accepted within the relevant expert community."

As to the first—the absence of "scientific testing and replication"—we are unable to discern any "fit" between this guidepost and the case facts. When an expert testifies concerning his or her own scientific or technical research, comparable (or incomparable) results obtained through independent testing and attempts at replication supply valuable reliability measures. "That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were 'derived by the scientific method.'" *Daubert v Merrell Dow Pharm, Inc*, 43 F3d 1311, 1317 (CA 9, 1995). Testing and replication assume central importance in product liability actions in which experts propose alternate designs, or in causation disputes. See *Bitler v A O Smith Corp*, 400 F3d 1227, 1235 (CA 10, 2004); *Cummins v Lyle Indus*, 93 F3d 362, 368 (CA 7, 1996) ("Our cases have recognized the importance of testing in alternative design cases.").

Here, however, no testing or "replication" underlies either side's expert opinions. And we fail to understand how standard-of-care opinions such as Priebe's could ever be tested or replicated. How does one scientifically "test" whether severing the wrong bile duct is a breach of the standard of care? Physical recreation or reenactment of Elher's surgery is neither feasible nor helpful; some conclusions simply defy measurement or verification through randomized clinical trials. The Massachusetts Supreme Court has similarly concluded that "testing" lacks relevance in the standard of care context: "[B]ecause the standard of care is determined by the care customarily provided by other physicians, it need not be scientifically tested or proven

account . . . ." *Webster's New World Dictionary of the American Language* (2d College Ed), p 303. We note that in other statutory schemes involving "factors," the Legislature has required more than mere consideration. For example, in child custody cases, a court must "consider[], evaluate[], and determine[]" the identified factors concerning the best interests of the child. MCL 722.23. When arbitrating a public labor dispute, "the arbitration panel shall base its findings, opinions, and order upon the following factors. . . ." MCL 423.239. Although the trial court did not reference any factors other than (a), (b) and (e), defendants have not argued that any other factors also bear relevance.

effective: what the average qualified physician would do in a particular situation *is* the standard of care." *Palandjian v Foster*, 446 Mass 100, 105; 842 NE2d 916 (Mass, 2006).[8] Because Dr. Priebe's opinion simply does not implicate any possible testing or replication, the trial court abused its discretion by using this factor to exclude his testimony.

Next, we consider peer-review publication. In *Edry*, our Supreme Court noted that "while not dispositive, a lack of supporting literature is an important factor in determining the admissibility of expert witness testimony." *Edry*, 486 Mich at 640. To buttress that statement the Court cited back to *Daubert*, in which the Supreme Court observed:

> Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability and in some instances well-grounded but innovative theories will not have been published. Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised. [*Daubert*, 509 US at 593-594 (citations omitted).]

Dr. Priebe testified that there is no peer-reviewed literature addressing whether cutting the common bile duct during laparoscopic gallbladder surgery qualifies as a breach of the standard of care. Defendants' article submissions do not rebut that statement.

The Fischer article is an editorial expressing an opinion. It is not scientific or medical research, the report of an experiment, or an analysis of data. Instead, the editorial is directed in part at rebutting "the trial bar"—hardly a scientific endeavor. See Fischer at 830. As an expression of Dr. Fischer's personal point of view, it is no more inherently trustworthy than Dr. Priebe's thesis. At best, both represent but one doctor's opinion. Although Dr. Fischer's views were published in a medical journal, the article shares none of the hallmarks of peer-reviewed research. Peer review subjects an article to critical, rigorous analysis. Peer-reviewed medical articles often include reviewers' comments, or at least some indication of peer review. And even assuming that the editors of The American Journal of Surgery read and approved publication of

---

[8] "However, when the proponent of expert testimony incorporates scientific fact into a statement concerning the standard of care, that science may be the subject of a [*Daubert*] inquiry." *Palandjian*, 446 Mass at 108-109. For example, in *Palandjian*, the Massachusetts Supreme Court held that whether a patient was actually at increased risk of gastric cancer presented an issue subject to challenge by application of the *Daubert* guideposts. Similarly, whether a particular therapy likely would have prevented injury or death presents a testable question. The results of such testing may well dictate the standard of care or negative a causation claim.

Dr. Fischer's editorial, we are hard pressed to conclude that this screening process qualifies as true peer review. "At its most basic level, true peer review occurs whenever a scientist replicates and tests research results shared by another scientist." Chan, Note, *The "Brave New World" of Daubert: True Peer Review, Editorial Peer Review, and Scientific Validity*, 70 NYU L Rev 100, 113 (1995). "Neither courts nor scientists should blithely assume that publication in a purportedly 'peer-reviewed' journal is a seal of approval for a particular methodology or theory." Anderson, Parsons, & Rennie, *Daubert's Backwash: Litigation-Generated Science*, 34 U Mich J L Ref 619, 637 (2001). See also *Valentine v Pioneer Chlor Alkali Co, Inc*, 921 F Supp 666, 675 (D Nev, 1996) ("Editorial peer review 'is not and cannot be an objective scientific process, nor can it be relied upon to guarantee the validity or honesty of scientific research, despite much uninformed opinion to the contrary.'").

Moreover, the Fischer article supports rather than refutes Dr. Priebe's thesis that common bile duct injuries can represent standard of care violations. The article quotes other literature representing that "practice below the standard" is not a cause of "97% of bile duct injuries," and further provides that "common [bile] duct injury . . . *might* not be 'practice below the standard.' " Fischer at 831 (emphasis added). We take this to mean that in some cases, injury to the common bile duct *is* a standard of care violation. Dr. Fischer specifically references the conflicting views of other surgeons: "I know I may be opposed by some hepatobiliary surgeons who would argue that 'if you don't know what you you're doing, you shouldn't do it.'" *Id.* Indeed, Dr. Fischer refers to proponents of this view as "purists," acknowledging that his standard of care argument would "draw howls" from both "experienced surgeons" and "the legal bar." *Id.* Similarly, Dr. Way's article acknowledges that some bile duct injuries are the product of "faulty decision making" or "knowledge error[s]," terms consistent with negligence concepts. Way at 461. In other words, the record evidence demonstrates surgical experts' agreement that common bile duct injuries sometimes result from standard of care violations.[9]

We draw from Dr. Fischer's editorial and the Way article the obvious lesson that under some circumstances, a breach of the standard of care may constitute the proximate cause of a common bile duct injury. How to define those circumstances is a hot-button question among

---

[9] And according to Dr. Fischer, this entire discussion falls outside the realm of science: "Surgery is not a science. It is an art." Fischer at 831. The Massachusetts Supreme Court concurred with this sentiment in *Palandjian v Foster*, 446 Mass 100, 108-109; 842 NE2d 916 (2006):

> We agree with the plaintiffs that expert testimony concerning the standard of care generally need not be subject to a *Daubert-Lanigan* analysis. Such testimony is based on the expert's knowledge of the care provided by other qualified physicians, not on scientific theory or research: "How physicians practice medicine is a fact, not an opinion derived from data or other scientific inquiry by employing a recognized methodology." However, when the proponent of expert testimony incorporates scientific fact into a statement concerning the standard of care, that science may be the subject of a *Daubert-Lanigan* inquiry. [Citations omitted.]

surgeons. But *Daubert* and MRE 702 focus "on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 US at 595. If an expert's reasoning is based on scientific principles, knowledge, experience and training, the testimony may fulfill the reliability standards even in the presence of conflicting conclusions predicated on precisely the same data, and an identical quantum of practical wisdom. This holds true even when a judge finds one side's approach more persuasive. The clashing standard of care opinions in this case are exactly the sort that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" is designed to resolve. *Id.* at 596.

Thus, the trial court abused its discretion by relying on "peer-review" as a reason to exclude Dr. Priebe's testimony. No evidence supports that the standard-of-care issue debated by the parties' experts has been tested, analyzed, investigated or studied in peer-reviewed articles. To the contrary, the supplied articles attest that well-qualified surgeons are enmeshed in vigorous debate about this question, and respect each others' views.[10] The experts disagree about the conclusions to be drawn from their collective experience, skill and training, rather than about science or methodology of laparoscopic gallbladder surgery.

Finally, we turn to the trial court's concern that "[t]here is no evidence as to the degree to which the opinion and its basis are generally accepted in the relevant expert community." The "general acceptance" factor and its limitations are at the heart of the Supreme Court's opinion in *Daubert*.

Justice Blackmun's analysis in *Daubert* commences with a review of the "general acceptance" test for admissibility embodied in *Frye v United States*, 293 F 1013 (DC Cir, 1923). *Frye* involved evidence derived from a "crude precursor to the polygraph machine." *Daubert*, 509 US at 585. The Supreme Court identified the following "famous (perhaps infamous) passage" as encapsulating the *Frye* rule:

---

[10] The Way article may qualify as peer-reviewed. However, this article explicitly recognizes that "faulty decision-making or a knowledge error" accounted for some of the bile duct injuries studied. Way at 461. This conclusion once again aligns with Dr. Priebe's opinion. Moreover, the "standard of care" definition utilized in the article is patently incorrect. The authors state:

> The theory underlying malpractice law rests on the principle that the patient has a fiduciary relationship to the patient, and as a consequence the patient can expect the physician's care to be of a certain high quality, defined as the standard of care. [*Id.* at 467.]

In Michigan, the applicable standard of care is that of the "ordinary" general surgeon. M Civ JI 30.01. "High quality" is not part of the equation. Given the article's implicit recognition that negligent errors sometimes cause common bile duct injuries and its definitional inaccuracy, we cannot conclude that it validates the proposition for which defendants have offered it: that bile duct injuries are never the product of surgical malpractice.

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stage is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.*" [*Id.* at 585-586, quoting *Frye*, 293 F at 1014 (emphasis in original).]

This test, the Supreme Court held, was superseded by FRE 702. And "nothing in the text of this Rule establishes 'general acceptance' as an absolute prerequisite to admissibility." *Daubert*, 509 US at 588. The Court continued: "Nor does respondent present any clear indication that Rule 702 or the Rules as a whole were intended to incorporate a 'general acceptance' standard." *Id.*

In addition to rejecting *Frye*'s "general acceptance" mandate on these grounds, the Supreme Court reasoned that *Frye* cannot be reconciled with the letter or the spirit of the federal rules of evidence:

[A] rigid "general acceptance" requirement would be at odds with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony." Given the Rules' permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention 'general acceptance,' the assertion that the Rules somehow assimilated *Frye* is unconvincing. *Frye* made "general acceptance" the exclusive test for admitting scientific testimony. That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials. [*Id.* at 588-589 (citations omitted).]

Despite having cast aside "general acceptance" as the sine qua non of admissibility, the Supreme Court reserved a place for consideration of this factor in a trial court's assessment of whether the reasoning or methodology underlying expert testimony is scientifically valid:

A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique which has been able to attract only minimal support within the community" may properly be viewed with skepticism. [*Id.* at 594 (citations omitted).]

Dr. Priebe grounded his opinions in his own experience and training, and denied any awareness of whether his viewpoint was generally shared by other general surgeons. Aside from polling board-certified general surgeons on the question (which would raise a host of vexing methodology issues), we are unpersuaded that "widespread acceptance" of a standard of care

statement can be found.[11]  Moreover, the record reflects no disagreement about the standard-of-care in this case: a surgeon performing laparoscopic gallbladder surgery must strive to avoid injury to the common bile duct.  This standard remains unchallenged by defendants.  The parties diverge only as to the circumstances that give rise to a *breach* of that standard.

The dissent blurs this critical distinction.  According to our dissenting colleague, "Defendants maintain that a common bile duct injury is a known complication to a laparoscopic cholecystectomy which may occur even when" the procedure has been executed "in a reasonable manner consistent with the governing standard of care."  In contrast, the dissent asserts, Dr. Priebe "has opined that, in the absence of scarring or inflammation, the standard of care requires a physician performing a laparoscopic cholecystectomy not to clip the common bile duct under any circumstance."  This comparison conflates the standard of care with the actions or inactions constituting a *breach* of that standard.  The record evidence demonstrates that the parties agree that the standard of care is precisely what Dr. Priebe said it was: operating surgeons must endeavor to carefully identify the bile ducts to avoid cutting or clipping the common bile duct.  Defendants' experts never challenged this proposition.  Rather, the experts dispute whether a physician deviates from the care expected of a reasonable physician when, despite clear visibility of the anatomy, the physician clips the common bile duct.

Thus, Dr. Priebe's knowledge of standard of care, and that the standard of care flows from national norms, is a given.  Nor does the record sustain the dissent's contention that only Priebe's "personal views" buttress his opinion that clipping Elher's common bile duct constitutes a breach of the standard.  The Fischer and Way articles verify that "purists" in the surgical world agree with Priebe, and consider injuries such as Elher's to be malpractice.  Dr. Priebe echoes those "purists."

Dr. Priebe's opinion in this case, distilled to its essence, hardly qualifies as novel, groundbreaking, or even dubious.  Relying on Dr. Misra's sworn testimony that Elher's gallbladder area was not scarred or inflamed and that through the laprascope, the cystic duct was "well-identified," Dr. Priebe opined that Dr. Misra breached the standard of care by clipping the wrong duct.  Dr. Priebe's extensive experience in laprascopic gallbladder surgery qualified him to opine as to what could and should have been seen when the anatomy is clearly delineated.  In *Dickenson v Cardiac & Thoracic Surgery of Eastern Tennessee, PC*, 388 F3d 976 (CA 6, 2004),

---

[11] The record contains no evidence of a widely-accepted statement regarding whether clipping the common bile duct during uncomplicated laparoscopic cholecystecomy surgery qualifies as medical negligence.  And even if such a statement existed, some courts have held that *Daubert*'s reliability factor simply does not contemplate "delegating to industry groups the gatekeeping duties of the courts."  *Adams v Lab Corp of America*, 760 F3d 1322, 1334 (CA 11, 2014).  See also *Marietta v Cliffs Ridge, Inc*, 385 Mich 364, 370; 189 NW2d 208 (1971).  Employing a similar analysis, the Florida Supreme Court has held that an expert in a medical malpractice action may not "bolster" his standard of care testimony by referring to consultations with other experts.  *Linn v Fossum*, 946 So2d 1032, 1039 (Fla, 2006).

the Sixth Circuit reached the same conclusion, holding that a physician's experience and training sufficed to render his opinion scientifically reliable. The Sixth Circuit expounded:

> *Daubert*'s role of "ensuring that the courtroom door remains closed to junk science," is not served by excluding testimony such as Dr. Johnson's that is supported by extensive relevant experience. Such exclusion is rarely justified in cases involving medical experts as opposed to supposed experts in the area of product liability." [*Id.* at 982 (citation omitted).]

*Dickenson* instructs that a physician need not "demonstrate a familiarity with accepted medical literature or published standards in [an area] of specialization in order for his testimony to be reliable in the sense contemplated by Federal Rule of Evidence 702." *Id.* at 980. Rather, " 'the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of *experience*.' " *Id.*, quoting Fed R Evid 702 advisory committee note (2000 Amendments) (emphasis in *Dickenson*). The Third Circuit reached a similar conclusion in *Schneider*, 320 F3d at 406, finding the challenged expert's testimony reliable based on his experience. That experience, the Third Circuit explained, sufficed as "good grounds" for the expert's standard of care opinion. *Id.*

No objective, verifiable evidence presented to the trial court addresses whether Dr. Priebe's view lacks "general acceptance." This is not surprising, as unlike many questions in medicine or science, the question is simply not an empirical one. Research, data collection, and testing cannot supply an answer. Accordingly, the "general acceptance" guidepost is not pertinent here. Whether injuring the common bile duct during uncomplicated laparoscopic gallbladder surgery is a standard of care violation calls for a value judgment derived largely from an expert's education training and experience, not a scientific pronouncement. Such opinions are not the product of "methodology" or "technique." Rather, the reliability of an opinion that cannot be tested, replicated, or objectively analyzed depends on "whether the expert's qualifications create a foundation adequate to support the expert's statement of the standard of care." *Palandjian*, 446 Mass at 108 n 12.

Moreover, holding Dr. Priebe's testimony inadmissible because it lacks "general acceptance" would fly in the face of *Daubert*: "Nothing in the text of this Rule establishes 'general acceptance' as an absolute prerequisite to admissibility." *Daubert*, 509 US at 588. *Daubert* rejected *Frye*'s rigid and "austere" application of the "general acceptance" test, and we perceive no reason to resurrect *Frye* in a case involving legal rather than scientific judgments.[12]

---

[12] We note that MCL 600.2955(1)(c) mentions "general acceptance" as a factor for consideration: "The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards." The parties have not brought forward any "generally accepted standards" that would foreclose the experts' opinions. MCL 600.2955(2) states: "A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and

Defendants and the dissent make much of Dr. Priebe's concession that he has never discussed his view of the standard of care with "his colleagues" at Case Western. According to defendants and the dissent, Dr. Priebe improperly testified to the standard of care based only on his personal "belief system," thereby proving its outlier status. Here is the specific testimony at issue:

> Q. To reiterate, we're here at your deposition four months before trial. You've reviewed the materials that you felt were pertinent in this case, and you know you're here today to offer your final standard-of-care opinions, true?
>
> A. That's correct.
>
> Q. And as it relates to that opinion, you cannot cite to a shred of medical literature, a medical authority, to support that opinion other than your own belief system, true?
>
> A. There is no authority that exists to do that, so that's true. But there is no authority that does that. So the answer is true.

Once qualified as an expert, a witness expounds on that which the expert believes to be true, based on the expert's "knowledge, skill, experience, training or education." MRE 702.[13] By applying available gatekeeping tools, the trial court determines whether the expert's testimony will assist the jury and derives from a reliable methodology. If medical or scientific literature defines a standard of care, that literature is certainly pertinent to the court's analysis. Here, however, the record supports Dr. Priebe's assessment that "no authority" and no literature define what constitutes a breach of the standard of care. Different doctors have different viewpoints on the subject. Contrary to defendants' argument, no rule of evidence and no case law require that an expert's standard of care opinion be universally accepted, or that an expert affirmatively demonstrate that his or her standard of care view falls within "the mainstream." Gatekeeping courts are not empowered "to determine which of several competing scientific theories has the best provenance." *Ruiz-Troche v Pepsi Cola of Puerto Rico Bottling Co*, 161 F3d 77, 85 (CA 1, 1998). The test is whether the expert's *reasoning* is scientifically sound. Moreover, imposing a universal acceptance test on testimony addressing a physician's breach or adherence to the standard of care would effectively eliminate medical malpractice litigation. Obviously, whether the standard of care has been breached is the central point of disagreement in most malpractice cases. The opinions on this score, while flowing from medical experience, training and literature, are not susceptible to proof by application of the scientific method, or objective verification, and therefore will vary based on the individual facts of each case.

---

disinterested experts in the field." There is nothing "novel" about the scientific evidence presented here.

[13] MRE 702 permits a qualified expert to testify "in the form of an opinion[.]" *Webster's New World Dictionary* defines "opinion" as: "a belief not based on absolute certainty or positive knowledge but on what seems true, valid, or probable to one's own mind; judgment." Thus, an expert's view as expressed in a courtroom flows from personal beliefs.

Dr. Misra admitted to clipping the wrong duct despite having "well-identified" the cystic duct. Dr. Priebe concludes that Dr. Misra should have correctly identified the anatomy—including the common bile duct—before clipping anything. Defendants claim that sometimes "illusions" get in the way, preventing clear delineation of the anatomy. *Daubert* was not designed to close the courtroom door on reasonable disagreements among qualified experts regarding the scientifically-supportable *conclusions* to be drawn from uncontested facts. Rather, such opinion clashes are for juries to resolve.

Ultimately, the gatekeeping inquiry asks whether the expert has reached his or her conclusions in a sound manner, and not whether the expert's conclusions are correct. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 590 US at 597. Alternatively stated, the trial judge is "a gatekeeper, not a fact finder." *United States v Sandoval-Mendoza*, 472 F3d 645, 654 (CA 9, 2006). Here, application of immaterial *Daubert* factors led the trial court to exclude expert testimony possessing none of the hallmarks of "junk science." "[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho*, 526 US at 156. Dr. Priebe demonstrated specialized knowledge regarding the subject type of surgery and the standards of care that would assist the jurors in deciding the central issue presented in the case. The trial court abused its discretion by excluding this testimony.

## B. RES IPSA LOQUITUR

The trial court correctly concluded that the res ipsa loquitur doctrine does not apply to Elher's medical malpractice claims.

The doctrine of res ipsa loquitur "entitles a plaintiff to a permissible inference of negligence from circumstantial evidence." *Jones v Porretta*, 428 Mich 132, 150; 405 NW2d 863 (1987). The doctrine's central purpose "is to create at least an inference of negligence when the plaintiff is unable to prove the actual occurrence of a negligent act." *Id.* When applicable, res ipsa loquitur functions as an evidentiary shortcut, permitting proof by circumstantial inferences rather than direct evidence. Plaintiffs invoking the res ipsa loquitur doctrine must satisfy the following conditions:

(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence;

(2) it must be caused by an agency or instrumentality within the exclusive control of the defendant;

(3) it must not have been due to any voluntary action or contribution on the part of the plaintiff; and

(4) evidence of the true explanation of the event must be more readily accessible to the defendant than to the plaintiff. [*Woodard v Custer*, 473 Mich 1, 6-7; 702 NW2d 522 (2005) (quotation marks and citation omitted).]

The Supreme Court emphasized in *Woodard* that whether an event does not ordinarily occur in the absence of negligence " 'must either be supported by expert testimony or must be within the common understanding of the jury.' " *Id.* at 7, quoting *Locke v Pachtman*, 446 Mich 216, 231; 521 NW2d 786 (1994).

> Although res ipsa loquitur is a doctrine of common sense, expert testimony is required when the issue of care is beyond the realm of the layperson, that is, where a fact-finder cannot determine whether a defendant's conduct fell below the applicable standard of care without technical input from an expert witness. [*Maroules v Jumbo, Inc*, 452 F3d 639, 644 (CA 7, 2006).]

Such input is required here. The manner in which a surgeon laparoscopically removes a gallbladder falls far outside the common knowledge of a layperson. So does the question of whether injury to the common bile duct qualifies as negligence or accident. The doctrine does not apply.

We affirm in part, reverse in part, and remand for further proceedings. We do not retain jurisdiction.


/s/ Elizabeth L. Gleicher
/s/ Jane M. Beckering

## Editorial Opinion

# Is damage to the common bile duct during laparoscopic cholecystectomy an inherent risk of the operation?

**Abstract.** Laparoscopic cholocystectomy has been practiced for close to 20 years. The rate of common duct injury remains somewhere between 0.4 to 0.7 percent and is approximately the same around the world. Recent papers have stressed ways in which laparoscopic common duct injury can be avoided, but none of the methods mentioned is foolproof. In addition, this complication can occur to even the most experienced laparoscopic surgeon. The author believes that injury to the common duct during laparoscopic cholocystectomy is not a result of the practice below the standard, but an inherent risk of the operation. This injury needs to be emphasized by the surgical community as an inherent risk of the operation, and patients should be fully informed of this potential complication.
© 2009 Elsevier Inc. All rights reserved.

While the advent and rapid spread of laparoscopic cholecystectomy is well known, for the purposes of this article it is probably best if the story is repeated. In the beginning academic medical centers did not recognize the speed, rapidity, and market forces that were to dominate cholecystectomy, how quickly it spread, the loss of open cholecystectomy, and the effect on the training of residents, which has hurt training programs ever since. The academic medical centers missed the boat. Open cholecystectomy, hernias, and breast biopsies were the 3 staple operations that postgraduate year 1 and 2 interns performed in academic medical centers. Open cholecystectomies with cholangiograms were the most complex surgeries that an intern did and were extremely valuable for the training of residents. The number of open cholecystectomies I performed as an intern made it possible for me as a first year resident (second year program) at the Massachusetts General Hospital to do a number of colectomies and gastrectomies in the first several months of my entering the program. For whatever reason, it is difficult to comprehend how the medical centers could have been so remiss on this amazingly popular procedure to which they paid almost no attention. The private sector, realizing the financial and practical implications, filled the void easily and quickly, leaving the academic centers out in the cold as it were, a lesson that has been learned and not forgotten. Weekend courses in laparoscopic cholecystectomy attracted hoards of surgeons. Rather than an orderly evaluation of laparoscopic cholecystectomy, the operation spread like wildfire to the extent that those who did not quickly learn it in academic medical centers were going to have to do without cholecystectomy as a commonly performed operation. The academic medical centers were helped by the companies that had a vested interest in the spread of minimally invasive surgery and turned to the academic medical centers in addition to the private sector to provide courses that were more rigorous and resulted in better trained laparoscopic surgeons, as well as improved course evaluations, etc. This partnership between the minimally invasive industries and the academic medical centers has continued to this day, although not with the original largesse that accompanied the generous funding of simulation centers. While some funding continues, it is on a diminished basis.

There have been a number of effects of the rapid growth of laparoscopic cholecystectomy. For one thing there had to be standards; thus standards were set for the percentage of "the lazy gallbladder," which in some laparoscopic series accounted for an inordinately large number of cholecystectomies to the extent that in some hospitals surgeons whose practice consisted largely of cholecystectomy without stones were threatened with loss of privileges if this did not change. The demography of the patient population also changed significantly, although I am not aware of any hard data because it would not be concurrent. It does appear as if patients in the early quintile of disease who an open operation would have frightened because of the painful incision

* Corresponding author. Tel.: +1 617 754 9242; fax: +1 617 754 9230.
E-mail address: Jfische1@bidmc.harvard.edu

Manuscript received March 9, 2009; revised manuscript March 9, 2009