*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NICOLE ANN JANOWSKI, as Next Friend of
ISABELLA CASE,

Plaintiff-Appellant,

v

DEERE & COMPANY,

Defendant-Appellee,

and

STARR CALLAHAN,

Defendant.

UNPUBLISHED
July 11, 2019

No. 340665
Genesee Circuit Court
LC No. 14-103771-NI

Before: M. J. KELLY, P.J., and MARKEY and GLEICHER, JJ.

PER CURIAM.

Following a nine-day trial, a jury found no cause of action against Deere & Company in this product liability case involving a riding lawnmower. Plaintiff contends that the trial court's erroneous evidentiary rulings and incomplete jury instructions led to an unjust result. Although we sympathize with plaintiff, we discern no prejudicial error and affirm.

## I. BACKGROUND

Nicole Janowski filed suit against Deere & Company after her four-year-old daughter was injured in a riding lawnmower accident. The operator was maneuvering the mower in reverse and collided with the child. The mower blades continued moving as the operator

reversed, striking the child and amputating a portion of her heel.[1]  Janowski complained that the mower was defectively designed and unreasonably dangerous because it was not equipped with "no-mow-in-reverse" or NMIR technology.  This technology, which was available when the mower was manufactured in 1994, works in one of three ways.  One forces the operator to shut off the blades before shifting into reverse.  If the operator fails to do so, the engine shuts down.  The second automatically disengages the blades when the operator shifts into reverse.  The third prevents the operator from shifting into reverse if the blades are engaged.  Janowski also challenged the adequacy of the warnings on the mower.

The parties presented competing witnesses regarding the utility and effectiveness of NMIR technology and whether it should have been incorporated into Deere riding mowers in 1994.  At issue on appeal is the pretrial deposition testimony of David Stricker, Deere's sole expert witness and its "corporate representative."  Stricker is an agricultural engineer who worked for Deere for 40 years and continues to consult with the company.  Stricker served as the manager of Deere's product development and product engineering services divisions.  He managed the group that designed the mower deck used in the subject tractor.  Stricker described in considerable detail the design choices that went into the production of the mower, a process in which he was directly involved.  Stricker also chaired Deere's product safety committee from 1999 through 2009.

Stricker testified based upon his personal experience and personal knowledge, rather than upon a review of articles and peer-reviewed literature.  He described in great detail the extensive testing process Deere used to explore NMIR technology and other safety features.  Stricker noted that Deere decided against incorporating an NMIR feature in its riding lawnmowers because it caused the engine to cut out frequently and interfered with the use of snowblower attachments on the machines.  Deere was concerned that users would disable the feature to improve functionality and accidentally impact other safety devices or injure themselves.  Deere also determined that the NMIR features then available were not sufficiently effective.  They allowed the mower blades to continue moving for up to 12 feet while the mower reversed.  This was the zone in which most backover injuries occurred.  In these regards, Stricker disagreed with plaintiff's mechanical engineering expert, Kevin Sevart, who opined that Deere should have used an NMIR system similar to that used by MTD, a Deere competitor.  Stricker expressed that Sevart failed to support his opinion with any statistical analyses or data.

Stricker opined based on his review of incident reports filed with the company that the subject mower "has been arguably one of Deere's safest mowers."  The tractor had several safety features built in, including a blade housing extending below the blade plane, a narrow discharge pattern, a longer distance from the blade to the back of the tractor, and "a very slow reverse speed" "[s]o if the operator does begin to back up, he's not doing so very quickly and doesn't cover a lot of ground."  The tractor also "has basically no blind spots," as nothing obstructs the operator's ability to "turn around and see" behind.

---

[1] Janowski filed suit against the operator of the lawnmower as well.  The jury entered a sizable judgment against her and she is not a party to this appeal.

Stricker based his opinion that the warnings used on the tractor were not defective on his experience in designing products for Deere, along with the training he received early in his career. He explained that based on his direct involvement in Deere's engineering processes, he "fully understand[s] how Deere not only develop[s] the warnings and labels for each individual product," but was also familiar with the "standards we try and follow when we do that." Deere's safety committee reviews and approves the warnings.

Before trial, plaintiff sought to exclude Stricker's testimony, asserting that his failure to produce any literature or other information supporting his expert opinions rendered those opinions unreliable. The Supreme Court's decision in *Elher v Misra*, 499 Mich 11; 863 NW2d 722 (2014), formed the centerpiece of plaintiff's legal argument. Plaintiff argued that *Elher* stands for the proposition that an expert must support his testimony with "evidence that his opinion [is] generally accepted in the relevant expert community," not just his "subjective belief" and "say so."

Deere responded that Stricker did not bring any documents to his deposition because Deere had already produced the relevant materials during discovery. Those documents included the ANSI standards,[2] the operator's manual for the tractor, video documentation of the tractor's inspection, photos of the tractor, and approximately 900 pages of materials documenting Deere's study of backover blade injuries. Deere emphasized that much of Stricker's testimony flowed from his personal knowledge of Deere's design process, and that Stricker was uniquely qualified to testify in that regard. Plaintiff never disputed Stricker's qualifications, Deere insisted, and failed to recognize that Stricker's opinions were based on his personal experience with the tractor's design.

The trial court denied plaintiff's motion after entertaining extensive oral argument, during which Deere's counsel suggested that plaintiff should have sought a *Daubert*[3] hearing instead. Counsel asserted that Stricker would have "pass[ed] the *Daubert* test with flying colors." The court found Stricker qualified to testify as an expert based upon his qualifications and as the materials upon which he based his opinions would be admitted into evidence.

The trial of this case consumed nine days. Relevant to the claims against Deere, plaintiff presented the testimony of two liability experts: Sevart and Lila Laux, an industrial psychologist and an expert in human factors. Sevart testified that the tractor was unreasonably dangerous and defectively designed because it did not include an NMIR feature. Sevart acknowledged that

---

[2] In 2003, the American National Standards Institute (ANSI) issued ANSI B71.1, which recommended for the first time an NMIR feature on riding mowers and was "intended to reduce the possibility of inadvertent blade contact at the rear of the machine by removing power from the mower blade during reverse operation, by increasing the operator's awareness of reverse operation, and by encouraging the operator to find alternate ways to mow instead of the reverse direction."

[3] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

Deere had tested such features, but believed that "convenience overruled safety" for the manufacturer. NMIR devices have proven effective, Sevart claimed, with "no accidents" reported from their use. He had never heard of an injury caused by an NMIR-equipped mower that occurred when the blade was spinning down. In his opinion, MTD's NMIR system would have prevented the injuries sustained in this case.

Dr. Laux's testimony concentrated on the warnings used on the tractor. She opined that warnings are not as effective as guards, and that a reasonable manufacturer aware of a known hazard should design the hazard out of the device rather than relying on warnings to keep users safe.

Plaintiff also presented the videotaped deposition testimony of Steve Eklund, a retired Deere engineer. Eklund had had been tasked to chair a project called Engineering Order 883. His charge was to perform a preliminary study of past accidents involving riding mowers, to determine the contributing factors to backover accident, and to develop engineering solutions. During this study Eklund collected reports of child backover injuries, some going back 20 years. The study did not result in a recommendation for the integration of NMIR technology.

Stricker testified as Deere's only liability expert. He admitted that Deere was aware of the danger of backover accidents involving children. But Stricker's testimony mostly focused on his Deere experience with the design of the tractor and the reasons Deere rejected an NMIR feature. The solutions for this tractor, Stricker asserted, included design features intended to reduce the need for reverse travel: a shorter turning radius, a mowing deck that allowed for trimming on both sides, and a discharge chute located in the back rather than a side. Deere rejected NMIR, Stricker explained, because it "didn't meet the needs of the customer," and because customers were "frustra[ted]" when they could not back up. According to Stricker, Deere had concluded that the MTD mower was a less safe machine, as it had a higher speed in reverse and could travel 10 to 11 feet before the blades actually stopped.

Stricker also testified regarding Deere's statistical analysis regarding the rarity of backover accidents, calculating that based on the number of mowers in service and the number of times per year on average each is used, there are more than 110,000,000 opportunities for backing up each year. Stricker estimated that "safety incidents" occur only in one out of 1,000,000 uses.

## II. ADMISSION OF STRICKER'S TESTIMONY

Plaintiff contends that the trial court should have excluded Stricker's testimony because it failed to meet the reliability requirements of MRE 702 and MCL 600.2955(1), as interpreted in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), and *Elher*, 499 Mich 11. We review for an abuse of discretion a trial court's decision regarding the admission of evidence. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). Despite that Stricker did not support his opinion with peer-reviewed literature, the court acted within its discretion in finding Stricker's reliability supported on other grounds.

A

MRE 702 governs the admission of expert testimony:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule incorporates the standards of admissibility set forth in *Daubert*. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). *Daubert* focuses on evidentiary reliability. It instructs trial courts to "determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 US at 592. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-593.

A *Daubert* analysis does not hinge on discovering "absolute truth" or "resolv[ing] genuine scientific disputes." *Chapin v A & L Parts, Inc*, 274 Mich App 122, 127; 732 NW2d 578 (2007) (opinion by DAVIS, J.). Rather, the trial court is tasked with filtering out unreliable expert evidence. "The inquiry is into whether the opinion is rationally derived from a sound foundation." *Id*. at 139. "The standard focuses on the scientific validity of the expert's methods rather than on the correctness or soundness of the expert's particular proposed testimony." *People v Unger*, 278 Mich App 210, 217-218; 749 NW2d 272 (2008).

In *Kumho Tire Co, Ltd v Carmichael*, 526 US 137; 119 S Ct 1167; 143 L Ed 2d 238 (1999), a product liability case, the United States Supreme Court reviewed and clarified the reliability principles advanced in *Daubert*. The Supreme Court held that engineering testimony, like the medical evidence considered in *Daubert*, must pass muster as reliable under FRE 702. *Kumho*, 526 US at 141-142. The Court elucidated that the analysis is tied to context: the facts of the case, and the nature of the opinions being offered.

> We also conclude that a trial court may consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination. [*Id*.]

The overarching question is whether the expert's testimony " 'has a reliable basis in the knowledge and experience of [the relevant] discipline.' " *Id*. at 149, quoting *Daubert*, 509 US at 592.

In *Kumho*, 526 US at 150, the Court explicitly recognized that in some cases involving engineering evidence, "the relevant reliability concerns may focus upon personal knowledge or experience." In *Elher*, 499 Mich at 25, the Michigan Supreme Court implicitly expressed the same view by pointing out that the *Daubert* factors are relevant to an inquiry under MRE 702 "even if all of the factors may not necessarily apply in determining the reliability of scientific testimony." Our Supreme Court emphasized, "[I]t is within a trial court's discretion how to determine reliability." *Id*.

MCL 600.2955(1) must also inform a trial court's consideration of reliability. The statute provides in relevant part:

> In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:
>
> (a)   Whether the opinion and its basis have been subjected to scientific testing and replication.
>
> (b)   Whether the opinion and its basis have been subjected to peer review publication.
>
> (c)   The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.
>
> (d)   The known or potential error rate of the opinion and its basis.
>
> (e)   The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.
>
> (f)   Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.
>
> (g)   Whether the opinion or methodology is relied upon by experts outside of the context of litigation. [*Id*.]

Four of the seven factors identified in MCL 600.2955(1) (subparts (a)-(d)) derive directly from *Daubert*, 509 US at 593-594, and overlap with the components of MRE 702. This Court has held that each of these statutory factors need not favor the proposed expert's opinion. *Chapin*, 274 Mich App at 137 (opinion by DAVIS, J.). It suffices that "the opinion is rationally derived from a sound foundation." *Id*. at 139. *Kumho*, 526 US at 151, posits that a similar approach

-6-

governs the application of FRE 702: "*Daubert* . . . made clear that its list of factors was meant to be helpful, not definitive. Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged."

*Elher*, the focal point of plaintiff's argument, is inapposite for several reasons. *Elher* was a medical malpractice case that arose from laparoscopic gallbladder surgery. During the procedure the defendant clipped the common bile duct rather than the cystic duct. *Elher*, 499 Mich at 14-15. Plaintiff's expert, Dr. Paul Priebe, testified that the defendant committed malpractice by clipping the common bile duct. But Dr. Priebe was unable to cite any medical literature supporting his opinion that a surgeon who clips the wrong duct has violated the standard of care. *Id.* at 15-17. The trial court excluded Dr. Priebe's testimony based on his failure to demonstrate its reliability by providing evidence that any other physicians, or the peer-reviewed literature, shared his standard-of-care view. *Id.* at 17-18.

This Court reversed, holding that Dr. Priebe's qualifications and extensive experience with gall bladder surgery sufficed to demonstrate the reliability of his opinions, and that the circuit court had abused its discretion by precluding their admission. *Elher v Misra*, 308 Mich App 276, 278; 870 NW2d 335 (2014). The Supreme Court disagreed and reversed this Court, emphasizing that "it is within a trial court's discretion how to determine reliability." *Elher*, 499 Mich at 25. The Supreme Court held that the trial court's decision to strike Priebe's testimony did not fall outside the range of principled outcomes, as "it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible." *Id.* at 23, quoting *Edry*, 486 Mich App at 642. The Supreme Court added that "[a] lack of supporting literature, while not dispositive, is an important factor in determining the admissibility of expert witness testimony." *Elher*, 499 Mich at 23.

Aside from not producing any medical literature in support of his position, Priebe also failed to demonstrate that his approach was generally accepted. *Id.* at 25. "Priebe admitted that he knew of no one that shared his opinion," the Court explained, and "[t]his was a relevant factor for the circuit court to consider." *Id.* at 26. The Supreme Court summarized:

> Plaintiff failed to provide any support for Priebe's opinion that would demonstrate that it had some basis in fact and that it was the result of reliable principles or methods. While peer-reviewed, published literature is not always necessary or sufficient to meet the requirements of MRE 702, the lack of supporting literature, combined with the lack of any other form of support, rendered Priebe's opinion unreliable and inadmissible under MRE 702. [*Id.* at 27.]

The Supreme Court's determination that Priebe could not testify rested on two pillars not present here. First, in *Elher* the Court emphasized that the standard of review under MRE 702 is for an abuse of discretion. The trial court's ruling in that case was not outside the range of principled outcomes, the Supreme Court declared. Here as well, the trial court's decision to admit Stricker's testimony is not devoid of a legal or factual basis. Second, *Elher* is a narrow decision that should be confined to its distinctive facts. In essence, the Supreme Court held that an expert may be disqualified under MRE 702 at the discretion of a trial court if the court finds the expert's experience and qualifications insufficient to establish the reliability of the expert's testimony. *Elher* bears no resemblance to this case.

Most of Stricker's testimony did not involve MRE 702 at all. Although Stricker offered opinions about the inadvisability of NMIR features, the safety of the tractor, and the cause of the accident, the bulk of his trial testimony focused on Deere's design process. Stricker testified as a fact witness rather than an expert when he recounted that Deere was aware of blade-contact injuries to children based on its own review of incident reports and considered whether to implement NMIR technology on its riding mowers. He testified as a fact witness rather than an expert when he described the reasons that Deere decided against doing so, including that in Deere's judgment NMIR features made the mower more difficult to operate, extended the mowing time, increased the likelihood of snowblower-related injuries, and would not eliminate all backover incidents. None of this testimony was subject to objection under MRE 702.

During Stricker's extended discussion of how and why Deere decided against incorporating an NMIR feature in this mower, he laid the foundation for his expert opinions. Those opinions were not unreliable despite that they flowed primarily from engineering knowledge and experience rather than published literature. Unlike in *Elher*, evidence of industry practices supported that the "standard of care" did not necessitate NMIR features.

The plaintiff in *Elher* presented no evidence that Dr. Priebe's standard-of-care opinion was shared by anyone else. Medical literature introduced by the defendant substantiated that it was *not* a breach of the standard of care to inadvertently clip the common bile duct during laparoscopic gallbladder surgery. The plaintiff failed to counter that literature with anything other than Priebe's unsupported opinion, derived solely from his experience and training and buttressed by nothing more.

Here, abundant evidence substantiated that the standard of care in the lawnmower manufacturing community did *not* require NMIR. Only one manufacturer, MTD, incorporated NMIR features in its riding mowers in 1994. This fact, standing alone, supports that Stricker's views about NMIR technology were within the mainstream of engineering thought at the time. Furthermore, defendants pointed out that none of the industry standards in place in 1994 required manufacturers to include NMIR technology as a standard feature. The ANSI standard did not mandate the use of NMIR features, and the CPSC refused to order that riding mowers include an NMIR feature despite a request that it do so. These facts establish that Stricker's views were generally accepted in the relevant technical community, and thereby reliable under MRE 702.

Although Stricker did not produce any peer-reviewed literature specifically stating that an NMIR feature was an unnecessary, unsafe, or otherwise inappropriate option, application of several of the factors listed in MCL 600.2955(1) also support the reliability of his views. Subsection (c) references "[t]he existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards." As discussed above, the standard discussed at trial, ANSI B71.1, did not require an NMIR feature at the time the mower was manufactured. Stricker's testimony was consistent with that standard. Subsection (f) addresses "[w]hether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered." That the overwhelming majority of manufacturers did not include NMIR features in 1994 demonstrates that other experts in

lawnmower design considered it unnecessary or inappropriate for other reasons. And Stricker's lengthy discourse regarding Deere's internal design process satisfies subsection (g), which asks "[w]hether the opinion or methodology is relied upon by experts outside of the context of litigation."

Stricker's opinions that backover injuries are rare and best addressed with warnings and design modifications that reduce the need for operators to shift into reverse also finds support outside of Stricker's mere "say so." Deere's calculation of the number of backover injuries per mower use was unchallenged during the trial, substantiating that backover injuries are, in fact, relatively uncommon. His explanation of the process Deere used to identify hazards, including backover accidents, and to design ways to avoid them, furnished evidence of a methodology that was neither novel nor unique in any way. Indeed, Sevart and Stricker both testified extensively regarding the "safety hierarchy," which Sevart considered part of "proper engineering methodology." Sevart described that the first step in the hierarchy is to "eliminate the hazard, . . . that's the best solution there is." The next step in the design-tier "is to provide safeguards to prevent people from coming into contact with . . . that hazard." If safeguards are impossible or impractical, Sevart continued, "then you go to the next step, which would be warnings and instructions." He added that a designer never uses warnings and instructions "as a substitute for the safeguards."

Stricker concurred with that approach, signaling that his methodology and Sevart's were actually identical. They differed in how the safety hierarchy could and should have been applied in the design of this mower. In Stricker's view, modifications other than NMIR technology sufficed to reduce the risk of backover injuries. Sevart insisted that an NMIR feature should have been required. This divergence of opinion does not mean that one expert was reliable and the other was not. To the contrary, the evidence supports that both views rested on an accepted and reliable engineering methodology, and were admissible. Accordingly, plaintiff's argument that Stricker's testimony should have been excluded lacks merit.

## III. FACT ADMISSION BY DEERE'S COUNSEL

Plaintiff next claims that the trial court erred by excluding evidence that Deere's counsel admitted at a pretrial hearing that Deere knew about the risk of backover accidents when it manufactured the riding mower in question. In the trial court, plaintiff asserted that this statement was admissible as a "judicial admission." On appeal, plaintiff additionally describes the statement as an evidentiary admission governed by MRE 801(d)(2). We review plaintiff's preserved challenge for an abuse of discretion and unpreserved claim for plain error. *Elher*, 499 Mich at 21; *Hilgendorf v St. John Hosp & Med Ctr Corp*, 245 Mich App 670 700; 630 NW2d 356 (2001). Here, counsel's statement was not a judicial admission and even if it was admissible on some other basis, the trial court's decision to exclude it was harmless.

The statement in question was made during a motion hearing concerning the admission of certain documents produced by retired Deere engineer Steve Eklund at his deposition. As noted, Eklund collected accident and incident reports involving Deere riding mowers as part of a feasibility study designed to investigate approaches to prevent backover injuries. Plaintiff filed a motion seeking to admit the accident and incident reports, arguing that they were not hearsay

because they would be introduced to prove the "effect on the listener" rather than their truth. Alternatively, the documents were admissible as ancient records, plaintiff claimed.

Defense counsel objected to the documents' admission, arguing that Eklund had merely collected and kept whatever came to him. Some of the documents were incomplete, others had been altered, and many merely excerpted longer documents no longer in existence. The collection lacked any indicia of reliability, counsel claimed. During the argument counsel also contended that plaintiff had no need to introduce the actual documents as "there is no question that Deere knew that there were other incidents" and "Deere has already conceded that it knew that other incidents were happening; and it already conceded that it knew this type of accident would happen, which is exactly why [an engineering study] was initiated." The trial court granted the motion to admit the documents but also permitted Deere to draft an instruction "address[ing] the fact that [they were] not being offered for the truth of the matter asserted."

During the trial, plaintiff attempted to introduce counsel's admission regarding Deere's notice, contending that counsel's statement constituted a binding judicial admission. The trial court denied plaintiff's request.

Two strands of caselaw describe judicial admissions. The first describes statements made by counsel *during* a trial, defining a judicial admission as "a statement made by a party or his counsel, in the course of trial, [which] is considered a binding judicial admission if it is a distinct, formal, solemn admission made for the express purpose of, inter alia, dispensing with the formal proof of some fact at trial." *Ortega v Lenderink*, 382 Mich 218, 222-223; 169 NW2d 470 (1969). This form of judicial admission is "beyond challenge," and must be narrowly interpreted by courts. *Hilgendorf*, 245 Mich App at 690. Counsel's statement that Deere knew that backover incidents had occurred does not meet the criteria for a binding judicial admission under this standard. It was not made at trial, and it was not made for the purpose of dispensing with formal proof of a fact at the trial. Rather, the statement was made during a motion hearing for the purpose of convincing the court that certain documents were inadmissible.

The other form of judicial admission arises under MCR 2.312, which addresses requests for admission, and is inapplicable here. "Admissions under MCR 2.312 are 'judicial' admissions. 2 McCormick, Evidence (4th ed), § 254, p 142 n 11." *Radtke v Miller, Canfield, Paddock & Stone*, 453 Mich 413, 420; 551 NW2d 698 (1996). Under either legal rubric, defense counsel's statement was not a judicial admission.

Alternatively, plaintiff contends that counsel's statement qualifies as an "evidentiary admission." Evidentiary admissions arise under MRE 801(d)(2), and are otherwise known as admissions by a party opponent. They are admissible as proof of disputed issues, but are not binding on the finder of fact.

Assuming that counsel's statement was an evidentiary admission, the trial court's failure to admit it as such was not plain error, and alternatively was harmless. "Plain error occurs at the trial court level if (1) an error occurred (2) that was clear or obvious and (3) prejudiced the party, meaning it affected the outcome of the lower court proceedings." *Duray Dev, LLC v Perrin*, 288 Mich App 143, 150; 792 NW2d 749 (2010). Plaintiff was not prejudiced by the failure to admit counsel's statement because abundant evidence demonstrated precisely the same point—that

Deere knew of injuries to children caused by operation of the riding mower in reverse. Stricker testified in great detail regarding Deere's awareness of backover injuries, that children were the frequent victims, and that backover injuries involving children were foreseeable. Thus, Deere repeatedly acknowledged through Stricker, its expert witness and spokesperson, that Deere had notice of backover injuries and their potentially severe consequences.

## IV. JURY INSTRUCTIONS

Finally, plaintiff challenges the trial court's rejection of her request to read M Civ JI 10.07 to the jury. We review such instructional challenges de novo, examining the instructions as a whole to determine whether the issues were "adequately and fairly presented to the jury." *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000).

Here, the court instructed the jury consistent with the applicable product liability statute—MCL 600.2946(2)—and product liability jury instruction—M Civ JI 25.31:

> The Plaintiff, Isabella Case, has alleged that Defendant, John Deere was negligent in producing the lawn tractor. John Deere has a duty to use reasonable care at the time of producing the lawn tractor so as to eliminate unreasonable risk of harm or injury that were reasonably foreseeable. Reasonable care means that degree of care that a reasonably prudent manufacturer would exercise under the circumstances that you find existed in this case. It is for you to decide, based on the evidence, what a reasonably prudent manufacturer would do or would not do under these circumstances. A failure to fulfill the duty to use reasonable care is negligence. However, John Deere had no duty to produce the lawn tractor to eliminate reasonable risk of harm or injury or risks that were not reasonably foreseeable.

However, plaintiff wanted the court to additionally instruct the jury:

> The law recognizes that children act upon childish instincts and impulses. If you find the defendant knew or should have known that a child or children were or were likely to be in the vicinity, then the defendant is required to exercise greater vigilance and this is a circumstance to be considered by you in determining whether reasonable care was used by the defendant. [M Civ JI 10.07.]

Plaintiff has cited no caselaw supporting that the manufacturer of a product must "exercise greater vigilance" in its design process when the manufacturer knows that the product will be used around children. Additionally, the risk-utility analysis required under Michigan law incorporates precisely the same concept. Most of the trial was devoted to an exploration of the risks of backover injuries to children posed by riding mowers lacking NMIR technology. The vast majority of the victims of backover accidents are children, as would be logically expected. Plaintiff's defective design claim focused virtually exclusively on precisely the same ideas set forth in M Civ JI 10.07. Plaintiff's theory that the standard of care required Deere to design a mower with features that would protect children when the operator moved in reverse was

adequately and fairly presented to the jury, and the standard instruction (M Civ JI 25.31) fully captured the essence of plaintiff's claims.

We affirm.

/s/ Michael J. Kelly
/s/ Jane E. Markey
/s/ Elizabeth L. Gleicher